1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   LARRY W. KIRK,

11          Petitioner,                    2: 09 - cv - 668 - TJB

12      vs.

13   S.M. SALINAS,

14          Respondent.                    <u>ORDER</u>

15   _____/

16      Petitioner, Larry W. Kirk, is a state prisoner proceeding with a *pro se* petition for writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner was sentenced to sixteen months in state

18   prison after a jury found him guilty of attempted making of terrorist threats, a felony, (Cal. Penal

19   Code §§ 664, 422) and misdemeanor battery.  In his Third Amended Petition (Docket No. 30,

20   incorrectly titled "Fourth Amended Petition"), Petitioner raises two claims for federal habeas

21   relief; specifically: (1) the trial court's failure to hold a competency hearing when substantial

22   evidence raised a doubt as to Petitioner's competency to stand trial violated his right to due

23   process under the Fourteenth Amendment ("Claim I") and (2) the trial court's reinstatement of

24   criminal proceedings after Petitioner's counsel had declared a doubt as to Petitioner's

25   competency and the trial court had ordered that he be medically examined violated his due

26   process rights ("Claim II").  Both Petitioner and Respondent consented to the jurisdiction of a

1

1  United States Magistrate Judge in this case.  Docket Nos. 12, 25.   For the reasons stated herein,

2  the federal habeas petition is denied.

3  II.  FACTUAL BACKGROUND[1]

4  Defendant Larry Wilber Kirk accosted bus driver Trina Anderson,
   calling her names and following her down the street. Defendant
5  spat at Anderson, told her "I ought to cut your throat," and
   threatened to have his girlfriend beat her up. . . .

6
7  The jury heard the following evidence at trial. On a December
   morning, bus driver Anderson had just completed her shift. She
   was scheduled to transfer her bus to a relief driver, but the new
8  driver had not arrived. Under Regional Transit's policy, Anderson
   could not leave the area until the arrival of the relief driver.

9
10 Anderson got off the bus, and the waiting passengers attempted to
   board the bus. Anderson asked them to disembark until the arrival
   of the relief driver. As she walked toward the adjacent light rail
11 station, defendant, one of the waiting passengers, began following
   her. He called her fat, ugly, and a bitch. Anderson had seen
12 defendant once previously when he was a passenger on her bus.

13 Anderson, who was talking on her cell phone, tried to ignore
   defendant. Defendant continued to insult her, and Anderson told
14 him to "F-off."

15 Anderson walked to the end of the station, but defendant continued
   to follow her as she quickened her pace. Defendant kept up his
16 flow of insults, repeating fat, ugly, and bitch and adding
   bald-headed. Anderson stopped and asked defendant if he wanted
17 to get back to the bus before it left, but defendant merely continued
   the insults.
18
19 Defendant stood about three feet away and spat at Anderson; the
   spittle landed on her jacket. Anderson yelled, "You spit on me!"

20 Defendant told Anderson: "I ought to cut your throat" and reached
   into his pocket. Anderson feared defendant was reaching for a
21 knife. Anderson did not know what to do; continuing down the
   street would have put her in a more isolated area, making her even
22 more vulnerable, so she stayed where she was.

23 Instead of a knife, defendant took a cell phone out of his pocket.

24 _____

25 [1]   The factual background is taken from the California Court of Appeal, Third
   Appellate District decision on direct appeal from April 2008 and filed in this Court by
26 Respondent on December 3, 2009 as Lodged Doc. 5 (hereinafter referred to as the "Slip Op.").

2

He told Anderson: "I'll get my girlfriend to come out here and beat you up." Defendant appeared to dial the phone and spoke into it, giving a physical description of Anderson as well as their location. Anderson believed she was in danger.

Anderson saw a police car and waved it down. She told the officers what happened. Defendant denied Anderson's allegations. A witness told officers defendant had spit on Anderson, and officers arrested defendant.

Sandra Cooper, a bystander at the station that morning, saw defendant and a bus driver arguing. After the driver got off the bus, Cooper saw defendant follow her. Cooper heard them exchanging words. When the pair were approximately 20 feet away, Cooper heard defendant tell the bus driver he would have his girlfriend "kick her ass" and that he would "slit her throat." Cooper saw defendant spit at the driver.

According to Cooper, the driver was trying to get away from defendant, but defendant kept following her. Cooper told officers what she had seen and saw them take defendant into custody.

Sacramento City Police Sergeant Elmo Banning, on duty that morning, observed a bus driver trying to flag him down. The driver, a short woman, looked scared. Anderson told Banning defendant spat on her.

Banning approached defendant and asked him what happened. Defendant said: "I didn't spit on that lady." Defendant did not tell Banning that Anderson had done anything wrong toward him. When handcuffed, defendant became remorseful.

According to Banning, defendant did not appear to be physically impaired. Banning remained on the scene for a very short time, assigning other officers to more completely interview the witnesses.

Defendant testified in his own behalf, denying the charges. The morning of the incident, defendant planned to have breakfast and go to the pharmacy. As he approached the bus he saw Anderson get off. Anderson told those waiting to board: "Don't get your asses on my bus. Get off my bus."

When a bystander replied, Anderson, looking directly at defendant, said: "[F]uck you, you fucking punk." Defendant, trying to be nice, shrugged off Anderson's words. Anderson continued cursing at him, calling into question his masculinity. Defendant finally responded, calling Anderson a whore and a slut and telling her, "I don't fuck with black bitches of [your] caliber ."

Defendant did not follow Anderson, spit on her, or threaten to cut

1

her throat. On the contrary, Anderson threatened to have someone kill defendant.

2

During cross-examination, defendant testified he took several psychotropic drugs. He is a borderline schizophrenic and bipolar. In addition, he tends to anger easily.

3

4

The jury found defendant guilty of attempted making of terrorist threats and misdemeanor battery.

5

6

## III.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

7

An application for writ of habeas corpus by a person in custody under judgment of a state

8

court can only be granted for violations of the Constitution or laws of the United States.  *See* 28

9

U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

10

*Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

11

Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

12

and Effective Death Penalty Act of 1996 ("AEDPA") applies.  *See Lindh v. Murphy*, 521 U.S.

13

320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

14

decided on the merits in the state court proceedings unless the state court's adjudication of the

15

claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

16

clearly established federal law, as determined by the Supreme Court of the United States; or (2)

17

resulted in a decision that was based on an unreasonable determination of the facts in light of the

18

evidence presented in state court.  *See* 28 U.S.C. § 2254(d); *Perry v. Johnson*, 532 U.S. 782, 792-

19

93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000).

20

In applying AEDPA's standards, the federal court must "identify the state court decision

21

that is appropriate for our review."  *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).

22

"The relevant state court determination for purposes of AEDPA review is the last reasoned state

23

court decision."  *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted).

24

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained

25

orders upholding that judgment or rejecting same claim rest upon the same ground."  *Ylst v.*

26

1   *Nunnemaker*, 501 U.S. 797, 803 (1991).  To the extent no such reasoned opinion exists, courts

2   must conduct an independent review of the record to determine whether the state court clearly

3   erred in its application of controlling federal law, and whether the state court's decision was

4   objectively unreasonable.  *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). "The

5   question under AEDPA is not whether a federal court believes the state court's determination

6   was incorrect but whether that determination was unreasonable—a substantially higher

7   threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

8   "When it is clear, however, that the state court has not decided an issue, we review that question

9   *de novo*." *Reynoso v.Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Rompilla v. Beard*,

10   545 U.S. 374, 377 (2005)).

11                       IV.  ANALYSIS OF PETITIONER'S CLAIMS

12       1.  Claim I

13       In Claim I, Petitioner alleges that he must be granted the writ because the state court was

14   unreasonable when it concluded the trial court did not error by failing to, *sua sponte*, hold a

15   hearing to determine Petitioner's competency to stand trial.  Petitioner's claim is based on the

16   report of a doctor appointed by the court to determine Petitioner's competency to stand trial,

17   which ultimately concluded he was not.  For the reasons stated below, the state court reasonably

18   concluded that under the circumstances of this case the report did not raise a substantial doubt as

19   to Petitioner's competence, and, therefore, no *sua sponte* hearing was required.

20       A.  Dr. Hoffman's Report

21       On December 21, 2005, only sixteen days after Petitioner's arrest, appearing before Judge

22   Patrick Marlette, Petitioner's initial counsel, Michael Richardson, informed the court that he had

23   a doubt as to Petitioner's competency to stand trial.  Rep.'s Augmented Tr. on Appeal, at 1.

24   Pursuant to California Penal Code section 1368, Judge Marlette suspended criminal proceedings

25   and appointed two doctors to meet with Petitioner and inform the court as to their opinion

26   regarding Petitioner's competency to stand trial.  *Id.*  On of the appointed doctors was Dr. Mark

1  Hoffman, Ph.D.  *Id.* at 2.  Petitioner wanted criminal proceedings to unfold as quickly as possible

2  in this case and, therefore, opposed his counsel's request.  *Id.* at 3; *see also* Rep.'s Tr. at 92

3  (Petitioner later discussing his opposition to counsel's stating a doubt as to his competency).  On

4  January 9, 2006, Petitioner's counsel requested to withdraw his doubt as to Petitioner's

5  competency.  Rep.'s Augmented Tr. on Appeal, at 4.  Judge Marelette, apparently being made

6  aware of the request off the record, asked Petitioner whether he was "in a problem situation with

7  [his] meds" at the time his counsel declared doubt.  *Id.* at 3.  Petitioner responded that the motion

8  was "made in error" and that he was currently on medication.  *Id.*  Judge Marlette allowed

9  Petitioner's counsel to withdraw his doubt, reinstated criminal proceedings, and asked that a

10 letter be sent to the doctors as soon as possible to inform them that he did not need a report.  *Id.*

11 at 4.

12      Dr. Hoffman, however, apparently unaware of the termination of the competency

13 proceedings, submitted a letter constituting his report to the court, dated January 18, 2006, and

14 addressed to Judge Marelette, discussing Petitioner's competency to stand trial.  The letter was

15 entered into the clerk's transcript of the proceedings.[2]  *See* Clerk's Tr. at 13-18.  However, there

16 is no evidence in the record to suggest the letter was, at any time, read by the trial court, as the

17 competency proceedings had been withdrawn.  Dr. Hoffman stated that he had performed a face-

18 to-face interview with Petitioner on January 17, 2006, eight days after Petitioner had told Judge

19 Marlette that he was on medication and criminal proceedings were reinstated.

20      Dr. Hoffman stated that from discussing the case with Petitioner's counsel, he had

21 learned that Petitioner claimed to have Bipolar Disorder.  *Id.* at 13.  He concluded that Petitioner

22 was "of borderline intellect" and that his answers to questions "often drifted off the point, or

23 were askew."  *Id.*  Petitioner said that he was born in 1962, knew it was 2006, yet believed that

24

25      [2]  The letter was initially omitted from the record submitted to this court as it was sealed
in the original state proceedings.  Pursuant to this court's order, Respondent filed Dr. Hoffman's
26 report under seal.  Docket Nos. 44, 45.  Citations to the report refer to the report's page number
in the clerk's transcript.

he was only 41 years old.  *Id.*  He could do simple addition, but "could not tell how much he would have left over if he had a dollar and bought something for 75 cents." *Id.* at 14.  Dr. Hoffman concluded that Petitioner's short-term, delayed memory was deficient.

In discussing Petitioner's past, Dr. Hoffman learned that Petitioner had dropped out of school at the sixth grade.  At some point, Petitioner could not specify, he spent some time at Atascadero State Hospital.  *Id.*  "Jail Psychiatry Services had recently placed him on Lithium (a mood stabilizer) and Seroquel (an anti-psychotic).  He also reported that his mother takes Lithium too, and that his father was also taking psychiatric medication before he killed himself." *Id.*

As to Petitioner's ability to understand legal proceedings, Petitioner "generally kn[ew] the role of attorneys, judge, and jury, but became bewildered and helpless in discussing more sophisticated concepts such as plea-bargains, and challenging witnesses."  *Id.*

Ultimately, Dr. Hoffman concluded: (1) Petitioner "has a serious mental disorder in the category of Major Mood Disorder with psychotic episodes"; (2) his "ability to understand legal and court proceedings, and to assist counsel in a rational manner are currently impaired.  He is not competent to stand trial"; (3) he "currently has the capacity to make semi-ration decision (i.e. give consent) regarding anti-psychotic medication, and is receiving such"; (4) "he poses no imminent threat of danger to self or others"; and, (5) "Anti-psychotic medication is medically appropriate . . . ; he is currently taking such medication, and this medication is necessary to restore his competence.  The likelihood of restoration of [his] competence without anti-psychotic medication is nil, and greatly improved with medication."

On the same day that Dr. Hoffman sent his report, Judge Marlette presided over Petitioner's case for the last time, allowing the public defender to withdraw due to a conflict and appointing a conflict criminal defender on Petitioner's behalf.  *See* Clerk's Tr. at 4.  The trial itself was heard before Judge Raoul Thorbourne.

/ / /

7

B.  The California Court of Appeal's Opinion

The last reasoned state court decision in this case is the California Court of Appeal, Third Appellate District's opinion upholding Petitioner's conviction on direct review.  *See* Slip. Op.  The California Supreme Court denied Petitioner's Petition for Review, without comment. *See* Lodged Doc. No. 7.  While Petitioner's case was on direct appeal, Petitioner also filed a state petition for habeas corpus.  That petition raised claims not raised in Petitioner's third amended petition in this case.  *See* Lodged Doc. No. 1.

In ruling on Petitioner's first claim, the California Court of Appeal stated as follows:

**Standard of Review**

A mentally incompetent defendant cannot be tried. (*People v. Hayes* (1999) 21 Cal.4th 1211, 1281 (*Hayes*).) Under section 1368, "[i]f, during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent.... At the request of the defendant or his or her counsel or upon its own motion, the court shall recess the proceedings for as long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time." (§ 1368, subd. (a).) In addition, if defense counsel informs the court of a belief that the defendant is mentally incompetent, the court must order a hearing to determine the defendant's competence. (§ 1368, subd. (b).)

A competency hearing must be held at any time before judgment when substantial evidence raising a doubt as to the defendant's competence is presented to the trial court. *(People v. Danielson* (1992) 3 Cal.4th 691, 726.) However, evidence regarding past events that supports only speculation regarding the defendant's possible current incompetence is not sufficient. (*Hayes*, *supra*, 21 Cal.4th at p. 1281.)

In reviewing a trial court's decision not to hold a competency hearing, we defer to the trial court, which is in a better position to observe the defendant's conduct and demeanor during trial. We reverse where substantial evidence of the defendant's incompetence has been shown and the court declines to hold a hearing. (*People v. Rogers* (2006) 39 Cal.4th 826, 847.)

A court's expression of concern about competency does not require commencement of competency proceedings. Once a trial court

8

declares actual doubts about the defendant's competency and orders a hearing, a failure to determine the competency issue strips the court of jurisdiction to conduct further criminal proceedings and requires reversal. Defense counsel may not waive these procedural requirements. (*People v. Price* (1991) 1 Cal.4th 324, 396-397; *People v. Marks* (1988) 45 Cal.3d 1335, 1337-1340.)

. . . . [discussion of Petitioner's second claim for relief] . . . .

**Dr. Hoffman's Report**

On January 18, 2006, nine days after the court reinstated proceedings, Dr. Hoffman's report was forwarded to the court. In his report, Dr. Hoffman concluded that "defendant's ability to understand legal and court proceedings, and to assist counsel in a rational manner are currently impaired. He is not competent to stand trial."

Defendant contends the report constitutes substantial evidence that defendant was mentally incompetent and argues that even if the court did not err in reinstating criminal proceedings, Dr. Hoffman's report was a "separate event triggering a separate exercise of this trial court's constitutional duty to ensure that the accused before it is legally competent to stand trial."

Defendant's argument would be compelling if the trial court had received and read the report. However, as the People point out, there is no evidence that the trial court was ever aware of the report. Following reinstatement of criminal proceedings, the court directed that the two doctors be informed that "I don't need a report." Thereafter, the court's comments suggest total ignorance of the report's contents.

Nevertheless, defendant insists that whether the court read the report is irrelevant under *People v. Tomas* (1977) 74 Cal.App.3d 75 (*Tomas*). In *Tomas*, the appellate court found it probable that, through an oversight, the trial court did not actually consider a doctor's report concluding the defendant was legally incompetent. The report was submitted to the court under an order appointing the doctor to examine the defendant and to file his report with the court. (*Id.* at p. 91.) The appellate court found "Dr. Derring's report was nonetheless available to the court and was substantial objective evidence giving rise to a doubt as to defendant's competence." (*Id.* at pp. 91-92.) The court reversed the judgment.

We understand the wisdom of a rule that imputes to the court knowledge of the contents of a report the court ordered but failed through oversight to consider. Here, unlike in Tomas, it was not an oversight that kept the trial court from considering the report. Indeed, the report was not "available" to be considered until after the reinstitution of proceedings, at which time the issue had been

1  resolved and largely forgotten. No further reference was made to

2  defendant's possible incompetence throughout the remainder of the
  trial. We note defendant points to no other evidence of his

3  incompetence to which the trial court was privy except for Dr.
  Hoffman's belated report, which it appears the trial court never

4  saw.

5  Slip Op. at 10-12, 14-15.

6    C.  The Court of Appeal's Determination that a *Sua Sponte* Competency Hearing
    was Not Warranted is Reasonable

7

8  "[T]he conviction of an accused person while he is legally incompetent violates due

9 process."  *Pate v. Robinson*, 383 U.S. 375, 378 (1966) (citing *Bishop v. United States*, 350 U.S.

10 961 (1956); *see also Medina v. California*, 505 U.S. 437, 439 (1992).  "To be competent to stand

11 trial, a defendant must demonstrate an ability 'to consult with his lawyer with a reasonable

12 degree of rational understanding' and a 'rational as well as a factual understanding of the

13 proceedings against him.'"  *Douglas v. Woodford*, 316 F.3d 1079, 1094 (9th Cir. 2003) (quoting

14 *Godinez v. Moran*, 509 U.S. 389, 396 (1993) (internal quotations and citation omitted)); *see*

15 *Dusky v. United States*, 362 U.S. 402 (1960).  In *Pate*, the Supreme Court held that a state court

16 must follow adequate procedures to protect against the conviction of a criminal defendant who is

17 incompetent to stand trial.  383 U.S. at 386.  Thus, when "'the evidence raises a *bona fide* doubt'

18 about the defendant's competency to stand trial, a trial judge must *sua sponte* conduct an

19 evidentiary hearing."  *McMurtrey v. Ryan*, 539 F.3d 1112, 1118 (9th Cir. 2008) (quoting *Pate*,

20 383 U.S. at 385) (internal quotations omitted); *see also Odle v. Woodford*, 238 F.3d 1084, 1087

21 (9th Cir. 2001); *De Kaplany v. Enomoto*, 540 F.2d 975, 979-80 (9th Cir. 1976) (interpreting

22 *Pate* and concluding that a defendant is entitled to a hearing if a reasonable judge would have

23 found a bona fide doubt of competence).  Stated another way, "Due process requires a state court

24 to hold a hearing where substantial evidence before the court 'indicate[s] the need for further

25 inquiry' into the defendant's competency."  *McMurtrey*, 539 F.3d at 1118 (quoting *Drope v.*

26 *Missouri*, 420 U.S. 162, 180 (1975)).

1    In reviewing whether the state court should have held a competency hearing, this court's

2  review is limited to the evidence available to the trial court.  *Williams v. Woodford*, 384 F.3d

3  567, 604 (9th Cir. 2004); *see also McMurtrey*, 539 F.3d at 1119.  The determination of whether a

4  hearing is necessary to determine a defendant' competency is often a difficult one.  As the

5  Supreme Court noted in *Drope v. Missouri*, 420 U.S. 162, 180 (1975)[3]:

6          The import of our decision in *Pate v. Robinson* is that evidence of
           a defendant's irrational behavior, his demeanor at trial, and any
7          prior medical opinion on competence to stand trial are all relevant
           in determining whether further inquiry is required, but that even
8          one of these factors standing alone, may, in some circumstances, be
           sufficient.  There are, of course, no fixed or immutable signs which
9          invariably indicate the need for further inquiry to determine fitness
           to proceed; the question is often a difficult one in which a wide
10         range of manifestations and subtle nuances are implicated.  That
           they are difficult to evaluate is suggested by the varying opinions
11         trained psychiatrists can entertain on the same facts.

12     In the present case, the California Court of Appeal applied the correct governing

13  principles established by the Supreme Court of the United States.  *See* 28 U.S.C. § 2254(d).

14  Notwithstanding the Court of Appeal's determination that the trial court was not "ever aware" of

15  Dr. Hoffman's report  and  "total[ly] ignora[nt]" of its contents, the transcript from the pre-trial

16  hearing on Petitioner's motion to represent himself at trial provides the following colloquy

17  between the trial judge and Petitioner's counsel:

18         The Court: Mr. Lippsmeyer, then there was something in the
           record, you mentioned, you allude to a [competency proceeding].
19         Was there a . . . formal proceeding in this case?

20         Mr. Lippsmeyer: Frankly, I don't know how it was ever done.  The
           public defender who had Mr. Kirk's case expressed a doubt.  One
21         doctor, whose report is in the file, which I have not seen, wrote an
           opinion, and the other one was called off somehow during the

22

23         [3]     *See also Miles v. Stainer*, 108 F.3d 1109, 1112 (9th Cir. 1997) (Among the factors
24  our court considers to determine whether there was sufficient evidence of incompetence are "the
    defendant's irrational behavior, his demeanor in court, and any prior medical opinions on his
25  competence" and "[n]one of these factors is determinative.  Any one of them may be sufficient to
    raise a reasonable doubt about competence.'); *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 489 (9th
26  Cir. 1997) (listing those three factors as "suggestive evidence" while noting that "no particular
    facts signal incompetence").

1         proceedings.  And somehow, and I do not know how you do it
without an adjudication.  That's the one anomaly in this case, is
2         that the Court withdrew its doubt or criminal proceedings were
then reinstated.  I don't know how that was done.  That was all
3         done before I got the case.

4   Rep.'s Tr. at 88.  When Petitioner was given the opportunity to speak a short time later, he said "I

5   got to see one doctor who said that I understood what was going on, but I was not competent to

6   stand trial.  That's what the man said.  Just like the rest of my psychs said." *Id.* at 92.  From the

7   foregoing it can be reasonably concluded that the trial judge was aware of the report, but did not

8   read or review it.

9        Judge Thorbourne was aware that Petitioner suffered from mental health problems, but

10   had the opportunity to both communicate with the Petitioner and observe his conduct in the

11   courtroom.  *See Atkins v. Virginia*, 536 U.S. 304, (2002) (Those with mental disorders

12   "frequently know the difference between right and wrong and are competent to stand trial," even

13   if they are regarded as less culpable because of their mental capacity); *Boyde v. Brown*, 404 F.3d

14   1159, 1166-67 (9th Cir. 2005) (Those with mental deficiencies are not necessarily incompetent to

15   stand trial).  Petitioner has failed to present any evidence that Judge Thorbourne was actually

16   aware of any reason to conclude that a competency hearing was required.  Moreover, Petitioner's

17   trial counsel expressly stated that he did not have a doubt about Petitioner's competency to stand

18   trial.  Rep.'s Tr. at 88-89.  When Petitioner's counsel did express a doubt, after the verdict but

19   before sentencing, it was on the basis that Petitioner had stopped taking his medication.  *Id.* at

20   418-19.  There is no evidence that Petitioner was not taking his medication throughout the trial.

21   Both doctors who interviewed Petitioner prior to sentencing concluded that he was competent to

22   stand trial.  *Id.* at 426.  That determination, which was more closely contemporaneous with

23   Petitioner's trial than Dr. Hoffman's report, was adopted by the trial court and the case continued

24   to sentencing.

25        While Dr. Hoffman's report may have lead a reasonable judge to conclude that a

26   competency hearing was required in this case, Petitioner fails to show that the trial court ever

reviewed the report.  Petitioner's counsel's initial declaration of doubt as to Petitioner's

competency was withdrawn, the court told the doctors that there was no need to send a report to

the court, and no discussion of Dr. Hoffman's report occurred until months later, on the eve of

trial, when Petitioner's counsel mentioned that there was a report in the record.  *Id.* at 89.  At that

same time, counsel stated that he had no doubt as to Petitioner's competency to stand trial.  *Id.*

The trial court was in the best position to observe Petitioner and determine whether a competency

hearing was required.  Petitioner fails to show that there was evidence available to the trial court

which required a competency hearing.  Thus, he is not entitled to relief on this claim.

II.  Claim II

In Claim II, Petitioner contends that the reinstatement of criminal proceedings after his

counsel had declared a doubt as to his competency, without a determination as to his

competency, violated his Constitutional rights.  The facts of this claim are discussed in detail

above.  Shortly after Petitioner's arrest, Petitioner's initial counsel expressed a doubt as to

Petitioner's competency to stand trial.  Rep.'s Augmented Tr. on Appeal, at 1.  Pursuant to

California Penal Code section 1368, the trial court suspended criminal proceedings, and

appointed two doctors to meet with Petitioner.  However, the competency proceedings were

withdrawn when Petitioner's counsel withdrew his doubt as to Petitioner's competency.  *Id.* at 4.

The trial court reinstated criminal proceedings and the case continued to trial.

To the extent that Petitioner claims that the trial court violated California law by failing to

follow the procedures set forth in California Penal Code section 1368, his claim is not cognizable

on federal habeas review.  *See* 28 U.S.C. § 2254(a) (the writ can only be granted for violations of

the Constitution or laws of the United States).

To the extent that Petitioner claims that the trial court violated his Constitutional rights by

reinstating criminal proceedings without a determination as to competency, he lacks the

necessary clearly established law, as determined by the Supreme Court of the United States, to

support his claim.  *See id.* § 2254(d)(2).  It is true that the Supreme Court has held that an

13

1    incompetent person cannot be tried and that a state must provide adequate procedures for

2    vindication of that right.  *See, e.g.*, *Pate*, 383 U.S. at 378.  However, the Supreme Court has

3    never articulated exactly what procedures must be followed when a defendant's counsel informs

4    the court that he or she has a doubt as to his or her client's competency.  *See Drope*, 420 U.S. at

5    172 (not holding state procedure to be constitutionally mandated).  Furthermore, while the Court

6    has held that a hearing must take place when the trial court has a bona fide doubt as to the

7    defendant's competency, the Court has never held that a hearing is required when the defendant's

8    counsel expresses such doubt.

9            For the foregoing reasons, Petitioner is not entitled to relief on this Claim.

10                                    V.  CONCLUSION

11           For the reasons discussed in this Order, Petitioner is not entitled to federal habeas relief.

12   Should petitioner wish to appeal the court's decision, a certificate of appealability must issue.  28

13   U.S.C. § 2253(c)(1).  A certificate of appealability may issue where "the applicant has made a

14   substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The

15   certificate of appealability must "indicate which specific issue or issues satisfy" the requirement.

16   28 U.S.C. § 2253(c)(3).

17           A certificate of appealability should be granted for any issue that petitioner can

18   demonstrate is "'debatable among jurists of reason,'" could be resolved differently by a different

19   court, or is "'adequate to deserve encouragement to proceed further.'"  *Jennings v. Woodford*, 290

20   F.3d 1006, 1010 (9th Cir. 2002) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)).[4]

21   / / /

22   / / /

23   / / /

24

25   ———————————

26       [4] Except for the requirement that appealable issues be specifically identified, the standard
     for issuance of a certificate of appealability is the same as the standard that applied to issuance of
     a certificate of probable cause.  *See Jennings*, 290 F.3d at 1010.

Accordingly, IT IS HEREBY ORDERED that:

1.   Petitioner's Petition for writ of habeas corpus is DENIED;

2.   A certificate of appealability shall issue as to Petitioner's first claim, and his first claim only; and

3.   The Clerk is directed to close this case.

DATED:  April 23, 2012

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE